UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ATKINSON TRADING CO., INC.
a New Mexico corporation,

       Plaintiff,

vs.                                                                                                CIV. No.  97-1261 BB/LFG

NELSON GORMAN, HOMER BLUEHOUSE,
KING MIKE, JR., LEANDER BERGEN, and ELROY
DRAKE, MEMBERS OF THE NAVAJO TAX
COMMISSION; and STEVEN C. BEGAY, EXECUTIVE
DIRECTOR OF THE NAVAJO TAX COMMISSION,

       Defendants.

## MEMORANDUM OPINION

THIS MATTER comes before the Court for consideration of Plaintiff's March 30, 1998 motions for summary judgment and trial *de novo* (Docs. 19 and 21), as well as Defendants' March 30, 1988 motion for summary judgment (Doc. 23).  The Court has reviewed the parties' submissions and the relevant law and, for the reasons set forth below, will DENY Plaintiff's motions and GRANT Defendant's motion.  Oral argument is not necessary.

**Procedural History**

This case involves a challenge to a Hotel Occupancy Tax ("HOT") enacted by the Navajo Tribe and applied to Plaintiff's customers.  Plaintiff initially challenged the tax in federal court, but the action was dismissed without prejudice because Plaintiff had not

exhausted its tribal remedies. Atkinson Trading Co. v. Navajo Nation, 866 F.Supp. 506 (D.N.M. 1994). Plaintiff then completed the exhaustion process by participating in administrative proceedings, including a trial-type hearing before a hearing officer of the Navajo Tax Commission ("NTC"), and by unsuccessfully appealing the NTC's adverse decision to the Navajo Supreme Court. Following that unsuccessful appeal, Plaintiff filed the instant action for declaratory judgment, requesting a ruling that the Tribe has no jurisdiction to impose the HOT on Plaintiff's overnight guests. As part of this action, the parties have submitted the entire record developed below, including transcripts and exhibits from the NTC proceedings and the appellate record created in the Supreme Court. Based on that record, Plaintiff and the Tribe have filed cross-motions for summary judgment on the jurisdictional issue. Plaintiff has also filed a motion for a trial *de novo*, which the Court will address initially.

### Motion for Trial *De Novo*

As Plaintiff acknowledges, the Tenth Circuit has recently decided that in cases such as this, concerning a tribal-court decision asserting jurisdiction over non-members, the proper standard of review is for this Court to review the tribal court's findings of fact for clear error, while applying a *de novo* review to the tribal court's conclusions of law. Mustang Production Co. v. Harrison, 94 F.3d 1382, 1384 (10th Cir. 1996). Plaintiff's motion for trial *de novo* is an attempt to avoid application of Mustang's deferential standard concerning factual matters. Instead, Plaintiff would have this Court engage in a

new fact-finding effort, even though Plaintiff had an opportunity to fully develop all the relevant facts in the administrative proceedings held by the NTC.

Plaintiff makes two main arguments in support of its position. First, according to Plaintiff, this Court should not give deference to the Navajo Supreme Court's findings of fact because several of them were not supported by the evidence presented at the administrative trial, and because the Supreme Court exhibited bias in its opinion. The Court notes, however, that in addressing this matter the Navajo Supreme Court was acting as a court of review, not a fact-finding court, and therefore any statements of fact made in its opinion are not "findings" that are to be given deference; rather, it is the fact-finder's determinations, the findings made by the NTC, that are entitled to such deference. Any "findings" the Supreme Court may have made that are not supported by the evidence are simply erroneous statements of the evidence presented below, and may be treated as such--that is, ignored or refuted--by this Court.

The Court also notes the "findings" about which Plaintiff complains are irrelevant to the issue presented to this Court. Plaintiff argues that the Supreme Court's opinion makes some statements about the nature of Plaintiff's business that were not supported by the evidence. In particular, Plaintiff complains about the Supreme Court's observation that Plaintiff uses Native American trappings to lure tourists to its establishment. Whether the Court's statements are true or not, they bear little or no weight on the question to be decided in this case, which is whether the HOT can be imposed on Plaintiff's non-Indian customers. Similarly, Plaintiff complains about the Supreme

Court's negative statements concerning the General Allotment Act, arguing that those statements are not based on any evidence presented during the trial and that they exhibit the Court's bias.  Again, these statements are irrelevant to the issues in this case, and are no more than restatements of a view held by many Indian and non-Indian scholars -- that the allotment policy turned out, in retrospect, to be a dismal failure.  <u>See, e.g.</u>, Felix S. Cohen, <u>Handbook of Federal Indian Law</u> 614 (1982 ed.).

In addition, Plaintiff does not contest any of the essential facts found by the NTC and relied on by the Supreme Court.  These include the Tribe's provision of police,  fire protection, and other services to Plaintiff's customers, as well as the physical location of Plaintiff's business.  There is no need for a *de novo* trial that would afford Plaintiff a second opportunity to contradict facts that it did not contest in the first proceeding.

Plaintiff's second argument against application of the <u>Mustang</u> standard of review is a contention that <u>Mustang</u> was wrongly decided.  Plaintiff recognizes this Court has no power to overrule <u>Mustang</u>, but wishes to preserve the issue for possible appellate review.  Plaintiff has correctly recognized the limits of this Court's power, and the Court need not address this argument further.

In sum, this Court's reading of the Navajo Supreme Court's opinion is that, even accepting Plaintiff's contention that the opinion makes some erroneous statements of fact that are not supported by the evidence, the opinion does not come close to exhibiting the type of bias that would justify applying a different standard of review to the tribal court's

decision than the standard adopted in Mustang. The Court will therefore apply the Mustang standard in this case.

**Motions for Summary Judgment**

**Facts:** The Court has reviewed the transcript of the NTC proceedings, depositions introduced into evidence during those proceedings, the exhibits submitted to the NTC, and the NTC's findings of fact. The facts supported by the foregoing may be summarized as follows. Plaintiff is a non-Indian New Mexico corporation that operates a business, known as the Cameron Trading Post, on fee land located within the boundaries of the Navajo Nation. The establishment is in Cameron, Arizona, a small community northeast of Flagstaff. Plaintiff's property is completely surrounded by reservation trust lands. The Trading Post consists of a hotel, restaurant, cafeteria, gallery, curio shop, retail store, and RV park. These businesses focus on the tourist market and deal almost exclusively with nonmembers of the Navajo Nation. A significant portion of the Trading Post's business is provided by tour buses that stop overnight either before or after visiting the Grand Canyon.

Plaintiff's customers travel on reservation land to reach the Trading Post, either on a federal highway or a state highway. These highways pass over rights-of-way granted by the Tribe. The highways are jointly patrolled by the Arizona state, and Navajo tribal, police, but the tribal police force is the primary provider of police protection to the Trading Post and the immediate vicinity. A substation of the Tribe's Tuba City police department is located in Cameron. When a 911 call is placed from the Post, the call is

referred to the tribal police for first response.  In addition, the Post has an alarm system that triggers calls to the tribal police.  That is, when the alarm goes off, the operator of the alarm system calls the tribal police, rather than a non-tribal law enforcement office, to request a response.[1]  The Trading Post has a non-loitering policy, and tribal police enforce that policy by requiring juveniles and others that are "hanging out" to move off the Post's property.  Tribal police provide assistance to motorists on the highways leading to the Trading Post, including giving directions and changing flat tires.

Fire protection in the area of the Trading Post is provided jointly by the tribal fire department in Tuba City, located about 25 miles from Cameron; the Bureau of Indian Affairs ("BIA") fire department (also located in Tuba City); a fire department called the Timberline department that is located 45 miles from Cameron; and the Grand Canyon fire department, located over 50 miles from Cameron.  The tribal and BIA departments cooperate closely with each other, and provide the primary response to calls from the Cameron area.  There has been at least one fire at the Trading Post, to which the tribal fire department as well as the Timberline department responded.

Emergency medical services in the Cameron area are provided by a tribal entity called the Emergency Medical Services Department ("EMS").  EMS maintains two ambulances in Tuba City.  EMS responds to all calls from locations within the Navajo

---

[1] As with many private alarm systems, there have been numerous false alarms triggered by the Post's system, including a number of false alarms caused by a cat wandering around the Post's attic.  The tribal police department's responses to the private alarms became much less prompt after a number of these false alarms.

Nation, and has responded to numerous calls concerning automobile accidents in the Cameron area. The tribal police and fire departments have also received and responded to many auto accident calls in the area, involving both Navajos and non-Navajos. If the state police called Flagstaff emergency services instead of the tribal EMS, however, the Flagstaff unit would respond to the call.

The Navajo Nation has a tourism department that provides information to prospective visitors over the telephone or through brochures. That department is also attempting to stimulate tourism by developing "vendor villages" in several locations on the reservation that receive heavy tourist use, including the Cameron area.

The Court notes that the Tribe has not questioned Plaintiff's standing to challenge the HOT, either in the tribal proceedings or in this Court. It is not entirely clear that Plaintiff does have such standing, since the tax is not imposed on Plaintiff but on its customers.[2] However, by failing to raise the issue the Tribe deprived Plaintiff of the

---

[2] By the express terms of the regulations implementing the HOT, which were approved by the Navajo Tribal Council when the HOT was enacted, the incidence of the tax falls on a hotel's customers, rather than the hotel itself. In fact, hotels collecting the tax on behalf of the Tribe, such as Plaintiff, are reimbursed for their administrative costs. Therefore, the incidence of the tax falls on Plaintiff's overnight guests, and it is the relationship between those guests and the Tribe that must be considered in deciding whether the HOT can be upheld. Cf. Oklahoma Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 459-60 (1995) (stating, albeit in the context of a state tax imposed on a tribe, that the "legal incidence" test is an initial and frequently dispositive question in Indian tax cases).

7

opportunity to make a factual record that might have established its standing.[3] The issue of standing, therefore, is not addressed in this opinion.

**Proper Analysis to be Applied:** As noted above, this case involves a tribe's attempt to impose a tax on nonmembers who are staying overnight on fee land located within the reservation boundaries. Plaintiff argues strenuously that, due to the fee-land status of its hotel and the nonmember status of most of its guests, the only jurisdictional factors properly considered in this case are those set out in Montana, 450 U.S. at 544-45, and reiterated in Strate, 117 S.Ct. at 1409. The Court will refer to these factors as the consensual-relationships test. The Tribe, on the other hand, maintains just as strenuously that the consensual-relationships test is not properly applied to this case, for several reasons. The Court will briefly discuss the Tribe's central arguments.

Issue/Claim Preclusion: The Tribe argues that Plaintiff is bound by either claim preclusion (res judicata) or issue preclusion (collateral estoppel) from re-litigating the

---

[3]There appears to be no precedent directly on point concerning application of the legal-incidence test to a situation involving a tribal tax, rather than a state tax. However, as the Court discusses below, the standard that should be applied to decide the jurisdictional issue in this case is the one set out in Montana v. United States, 450 U.S. 544 (1981), and reiterated in Strate v. A-1 Contractors, 117 S.Ct. 1404, 1409 (1997). Cf. Duncan Energy Co. v. Three Affiliated Tribes, 27 F.3d 1294, 1298-99 (8th Cir. 1994) (reversing summary judgment granted without addressing Montana factors raised by the tribe). This standard requires an analysis of whether the nonmembers sought to be taxed have entered consensual relationships with the tribe or its members, or whether those nonmembers' conduct threatens the tribe's political integrity, economic security, or health and welfare. By its very focus on the actions of the nonmembers over whom the tribe seeks jurisdiction, the Montana test seems to require application of the legal-incidence test. In this case, in particular, it is important to analyze the extent to which the hotel guests have entered a consensual relationship with the tribe, or have otherwise had enough of an impact on the tribe to allow the tribe to tax them.

jurisdictional issue raised in this case. This argument is based on a prior case decided by the Ninth Circuit, in which Plaintiff was held to be subject to the federal Indian Trader statutes and regulations. Ashcroft v. United States, 679 F.2d 196 (1982). In so holding, the Ashcroft opinion made several statements indicating Plaintiff is subject to tribal jurisdiction. According to the Tribe, these statements are dispositive of the issue raised in this case. However, the parties in the Ashcroft case were different, because the Tribe was not involved in Ashcroft and the United States was not acting in privity with the Tribe. Accordingly, the claim-preclusion doctrine is not applicable to this case. See Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1520 (10th Cir. 1990)(res judicata applies where there is an identity of parties). Also, the taxation issue in this case is not the same as the issue presented and necessarily decided in Ashcroft. That is, even if Plaintiff is an Indian Trader as far as its transactions with Navajos are concerned, that does not answer the question as to whether the Tribe has jurisdiction to tax Plaintiff's nonmember hotel guests. For this reason, issue preclusion is not appropriate in this case. See id. (collateral estoppel applies where the issues raised in the successive proceedings are the same, and determination of those issues was essential to the prior decision). Neither claim preclusion nor issue preclusion, therefore, prevents this Court from reaching the merits of the parties' arguments.

  Merrion Test vs. Montana Test: The Tribe also argues that the Montana test does not apply to taxation cases. Instead, argues the Tribe, tax jurisdiction, unlike regulatory or adjudicative jurisdiction, is strictly territorial in nature. According to the Tribe, as long

as the activity takes place within the Tribe's territorial jurisdiction, and the Tribe provides some services to the taxpayer, the Tribe may tax the activity. This argument is based on Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982), which discussed the tribe's provision of services and the "advantages of a civilized society" as a basis for tribal taxation of nonmember activity taking place on a reservation. Plaintiff responds to this argument by pointing out that Merrion involved activity occurring on tribal land, not fee land, and by arguing that the Merrion provision-of-services discussion has no applicability to fee-land cases. Instead, Plaintiff insists, the Montana consensual-relationships test is the only analysis properly applied to determine the limits of all tribal civil jurisdiction over fee land located inside a reservation, including the power to tax.

The Tribe's argument that Merrion is the proper test to apply is based on a Tenth Circuit case which, according to the Tribe, supports its claim that taxation jurisdiction is different than other civil jurisdiction, and is more strictly territorial. In Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1540-41 (10th Cir. 1995), a tribal-tax case, the Tenth Circuit held that the plaintiff would be required to exhaust its tribal remedies if its coal mine were determined to be located in Indian Country. In so holding, the Tenth Circuit made some statements about tribal jurisdiction to tax, connecting that jurisdiction with the definition of Indian Country found in 18 U.S.C. § 1151 -- reservations, allotments, and dependent Indian communities. The Court also concluded that "the Navajo Nation has authority to tax any mining activities taking place in Indian country without violating any express jurisdictional prohibitions." 52 F.3d at 1541.

Read broadly, the above language could be interpreted to mean the Tenth Circuit has established different guidelines for taxing jurisdiction than for regulatory or tribal-court civil jurisdiction. The Montana test would apply to regulatory matters and, pursuant to Strate, to cases involving civil litigation in tribal court. The 18 U.S.C. § 1151 definition of Indian Country, in conjunction with the Merrion provision-of-services test, would apply to tax-jurisdiction questions. The Court does not believe the Tenth Circuit intended such a broad reading of its holding. Instead, the language of Pittsburg & Midway must be read in light of the question that was answered in that case. The only issue before the Tenth Circuit was whether the tribe's attempt to impose a tax on the plaintiff's mine was "patently violative of express jurisdictional prohibitions," so as to excuse the plaintiff from exhausting its tribal remedies. 52 F.3d at 1539-40. For purposes of that question only, the Pittsburgh & Midway opinion holds that no express jurisdictional prohibition will be violated if the activity sought to be taxed takes place within Indian Country, as defined by 18 U.S.C. § 1151. That is, § 1151 creates, subject to other considerations such as the Montana and Merrion factors, a rebuttable presumption of jurisdiction to tax non-Indian activity taking place within a reservation, allotment, or dependent Indian community. Cf. Texaco, Inc. v. Hale, 81 F.3d 934, 938 (10th Cir. 1996) (In addition to the fact the tribally taxed activities occurred within Indian Country, both the district and appellate courts considered contractual and consensual relationships in deciding exhaustion of tribal remedies should be required). This does not mean, however, that all such activities taking place in locations that fall within Indian

Country are automatically taxable by the tribe.  It means only that nonmembers engaging in activity that is arguably located in Indian Country, who wish to challenge a tribal tax, will be required to exhaust their tribal remedies before proceeding to federal court.  The Court therefore does not accept the Tribe's argument that the <u>Pittsburg & Midway</u> opinion precludes application of the <u>Montana</u> test to the HOT involved in this case.

  <u>Consensual-relationships Test as Applied to this Case</u>: It is clear to the Court that the consensual-relationships test of <u>Montana</u> and <u>Strate</u> is the proper framework within which to analyze this taxation case.  In both <u>Montana</u> and <u>Strate</u>, the Supreme Court mentioned the tribes' right to tax certain activities as a matter of inherent sovereign power.  However, both opinions limit this power by imposing conditions on it, specifically stating that a tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, or that seriously affect the political integrity, economic security, or health and welfare of the tribe.  <u>Montana</u>, 450 U.S. at 565-66; <u>Strate</u>, quoting <u>Montana</u>, 117 S.Ct. at 1409.  The Supreme Court's inclusion of the taxation power within its discussion of the consensual-relationships test indicates that the test applies to that form of tribal jurisdiction as well as to tribal regulatory and judicial authority over non-members.

  On the other hand, <u>Merrion</u> cannot simply be ignored, as Plaintiff would have it, because the activity in this case takes place on fee land.  Where a tribe provides essential services within Indian Country, even to nonmembers and even on fee land, and thus affords the "benefits of a civilized society" to those nonmembers, fairness indicates that it

be allowed to impose taxes to help pay for those services.  This is merely the flip side of Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163 (1989), which upheld the application of state taxes to oil and gas extracted from a reservation by non-Indian companies.  In doing so, the Cotton opinion emphasized the fact that the state provided services to the companies and the tribe, and distinguished prior cases in which the state had in effect washed its hands of the activity and had nothing to do with the activity, save tax it.  490 U.S. at 186.  Of course, the tribe's interest in taxing an activity is strongest where the revenues derived from the activity are derived from value generated on a reservation, by tribal activity, and where the taxpayer receives tribal services.  Merrion, 455 U.S. at 138.  This does not mean, however, that the tribe has no such interest where the value is not generated by tribal activity and occurs on fee land, if services are provided anyway and the fee land is located in Indian Country.  The Merrion provision-of-services or benefits-of-a-civilized-society factors, thus, are relevant to the Montana test because they are indicators that the necessary consensual relationship is present to allow the tribe to impose a tax upon the fee-land activity.

  The real question with respect to tribal-taxation cases and the consensual-relationships test is whether the nonmembers' consensual activity within Indian Country is significant enough to allow the tribe to tax that activity.  Cf., e.g., Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408, 430-31 (1989) (tribe's interest in zoning fee lands within reservation becomes stronger as the impact on the tribe from activity on the fee lands becomes more serious).  The Court's

review of case law concerning tribal jurisdiction over nonmembers indicates that the extent to which a tribe will be allowed to regulate or affect non-Indian activity is often determined on a sliding scale, balancing the impact of the activity on the tribe with the severity of the tribe's proposed regulation, taxation, or other imposition of jurisdiction. Id.; cf. Cotton Petroleum, 490 U.S. at 186, n. 17 (discussing fact that certain state taxes were extraordinarily high and had a negative effect on the marketability of the tribe's coal as basis for disallowing taxes); see generally Washington v. Confederated Tribes of the Colville Reservation, 447 U.S. 134, 156 (1980) (principle of tribal self-government is grounded in notions of inherent sovereignty and congressional policies, and seeks an accommodation between the interests of the tribes, the federal government, and the state); Cohen, Handbook of Federal Indian Law 256-57 (describing Montana and Colville as applying a test based on the significance of tribal interests involved, to determine whether tribe would be allowed to exercise regulatory control or taxing authority over nonmembers).

  To properly perform the necessary balancing test required for determining whether the HOT was validly imposed on Plaintiff's hotel guests in this case, it is necessary to examine the nature of the relationship between those guests and the Tribe, and the extent to which the Tribe provides services to those guests while they are on the reservation, compared to the burden placed on those guests by the HOT. No explicit consensual relationship was created between the Tribe and the guests, such as would be present if the guests engaged in commercial transactions with the Tribe or its members. However,

where Plaintiff's customers travel onto the reservation, stay overnight, and take advantage of the establishment of a civilized society there, that is consensual activity. Cf. NMSA 1978, § 66-8-107 (by driving in New Mexico, motorists give implied consent to have their breath tested for alcohol if they are stopped for driving under the influence). The Court finds that one necessary predicate for taxation, a consensual relationship, was present in this case.[4]

The next step requires an analysis of the nature of the hotel guests' activity on the reservation and the extent to which the Tribe provides services that are relevant to that activity. The guests' activity, of course, consists of their trip to the reservation and their overnight stay. By engaging in that activity, the guests voluntarily put themselves in the position of possibly needing assistance from tribal personnel. Motor vehicle accidents involving tourists have occurred in the past and will almost certainly occur again. Tribal EMS personnel, police officers, and fire department personnel all respond to calls involving such accidents. In addition, tribal police officers provide directions to tourists, change flat tires, and provide other miscellaneous assistance. Furthermore, tribal police officers are the primary providers of law enforcement in the Cameron area, and regularly patrol the Trading Post, removing loiterers and intoxicated individuals. The mere presence of tribal police officers on the highways, enforcing traffic regulations and other

---

[4]The Court does not mean to imply that a consensual relationship is always a necessary prerequisite for taxation. Consideration of the other half of the Montana test, the significant-impacts factor, in an appropriate case may be sufficient to allow the tribe to impose its tax. It is not necessary to consider that possibility in this case.

15

laws, contributes to the safety of tourists by deterring unsafe or illegal behavior. Finally, the tribal tourism department provides information services to prospective or current visitors to the area, and is working on projects designed to enhance the experience of tourists visiting the reservation. In sum, the Tribe provides Plaintiff's overnight guests with the "benefits of civilized society" while the guests are present, and the presence of the guests creates a greater need, both actual and potential, for tribal services. The fact that some of these services are also provided, to a lesser extent, by the state of Arizona, does not lessen the Tribe's interest in the hotel guests' on-reservation activity.[5]

As to the burdens imposed by the Tribe on the nonmember guests, they are minimal. Unlike zoning restrictions or hunting and fishing regulations, which directly restrict nonmembers' ability to act or use their property in certain ways, the HOT involves only the payment of a tax of 8% of the room rate. There was evidence that this rate is lower than the occupancy-tax rate imposed by many municipalities, and Plaintiff made no attempt to argue that there was a great disparity between the amount of the tax paid and the services provided by the Tribe.

---

[5] The main difficulty with the application of the "benefits of a civilized society" test is that while government services in Indian Country are often sparse, both the tribe and state (including local and country entities) are allowed to impose taxes to pay for such services. This "dual taxation" puts business enterprises within Indian Country at a competitive disadvantage. See Robert W. Alexander, The Collision of Tribal Natural Resource Development and State Taxation: An Economic Analysis, 27 N.M.L.Rev. 387 (1997). Unfortunately, however, the most obvious and equitable solution to this dilemma, a revenue sharing agreement, is beyond this Court's power.

As the foregoing analysis shows, application of the balancing test required in cases such as this establishes that the Tribe has the authority to impose the HOT on Plaintiff's hotel guests. The services as well as the civilized society provided by the Tribe are directly related to activity engaged in on the reservation, and the burden created by the HOT is small. Under Cotton Petroleum and Merrion, a state has joint taxing authority with a tribe over non-Indian activity taking place on tribal lands, as long as the state provides some level of services. Similarly, where a tribe provides essential services to non-members who voluntarily visit the reservation, even if the visit is primarily to fee land, the tribe should at minimum have joint taxing authority over the activities to which the tribe's services are relevant. This is not a case in which the Tribe has nothing to do with the fee-land activity, save tax it. See Cotton Petroleum. Accordingly, the Court holds that the Tribe has jurisdiction to impose the HOT on Plaintiff's guests.[6]

---

[6]The Court notes that Plaintiff several times mentioned the fact that neither Plaintiff nor its overnight guests are entitled to vote in Navajo elections, and pointed out that the HOT was plainly designed to apply mainly to non-members, who are the ones most likely to be staying at hotels. Plaintiff did not develop the argument into a taxation-without-representation theme or provide legal authority. In any event, these facts have no impact on the validity of the HOT. All occupancy taxes are designed to shift some of the burden of financing government services from residents to nonresidents, and all such taxes apply mainly to nonresidents of the locality, who cannot vote in the elections that ultimately result in the enactment of occupancy taxes. See Miami Dolphins Ltd. v. Metropolitan Dade County, 394 So.2d 981 (Fla.App. 1981)(room tax not discriminatory as to nonresidents); see also People v. Evans, 57 Cal.Rptr. 276 (Cal.App. 1967) (tax on transients based on privilege of temporary occupancy and did not violate constitution). The Court has found no case invalidating a hotel occupancy tax on the basis that the parties paying the tax were not entitled to vote in the locality imposing the tax.

**Conclusion**

Based on the foregoing, the Tribe's motion for summary judgment will be granted, and Plaintiff's motions for summary judgment and for a trial *de novo* will be denied.

An Order in accordance with this Memorandum Opinion will issue.

DATED August 14, 1998.

                                                                         _____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE